457 So.2d 1298 (1984)
TRANSCONTINENTAL GAS PIPELINE CORPORATION
v.
The STATE OIL AND GAS BOARD OF MISSISSIPPI and Coastal Exploration, Inc., et al.
No. 55071.
Supreme Court of Mississippi.
September 5, 1984.
Rehearing Denied October 3, 1984.
*1304 John M. Grower, Jefferson D. Stewart, R. Wilson Montjoy, II, Brunini, Grantham, Grower & Hewes, Jackson, for appellant.
John Land McDavid, W. Eric West, McDavid & Noblin, Kenneth I. Franks, Glenn Gates Taylor, James Russell Tucker, Heidelberg, Woodliff & Franks, Jackson, Vernon L. Terrell, Jr., New Orleans, La., Walker L. Watters, William R. Presson, Gerald, Brand, Watters, Cox & Hemleben, Bill Allain, Atty. Gen., by P.L. Douglas, First Asst. Atty. Gen., Jackson, for appellees.
Before ROY NOBLE LEE, P.J., and ROBERTSON and SULLIVAN, JJ.
ROBERTSON, Justice, for the Court:

I. Introduction

This appeal arises out of a controversy regarding well head sales of natural gas produced in Marion County, Mississippi. This litigation has been conducted in the vortex of tensions created by collisions among basic principles of geology, economics and law when applied in a context where each litigant pursues self-interest.
The geological phenomenon of drainage necessitates, if considerations of fairness undergird our law, a rule that requires that a purchaser of natural gas (generally an interstate pipeline) take ratably from a common source of supply. That purchaser must market that gas, and the advent of deregulation has presented him with new and largely unanticipated difficulties in that regard. The natural gas market has become glutted. Prices consumers are willing to pay have fallen sharply.
Overlaid upon these tensions are those inherent within our federal system. Until 1978 the federal sovereign indisputably had preempted all state regulation of wellhead sales of natural gas. Today we are presented a question of first impression: whether the Natural Gas Policy Act of 1978 (NGPA) 15 U.S.C. §§ 3301, et seq., continues in effect this federal preemption with respect to wellhead sales of deregulated natural gas. A complementary proposition suggests that the regulatory efforts of the State Oil and Gas Board constitute an impermissible burden on interstate commerce proscribed under long-established Commerce Clause jurisprudence.
Below we reject these and other claims advanced under federal law. We find, furthermore, that the State Oil and Gas Board has acted well within its statutory authority in requiring that an interstate pipeline take ratably (if it takes at all) the natural gas produced from a common source of supply.
The State Oil and Gas Board has acted beyond its authority, however, insofar as it has proscribed differentials in wellhead prices. No act of the Legislature of this state authorizes regulation or control of the price paid for natural gas at the wellhead. More specifically, no enactment of the Legislature vests in the State Oil and Gas Board any authority to regulate such prices.
Order No. 409-82 of the State Oil and Gas Board is affirmed in part and reversed in part.

*1305 II.

A. The Cast of Characters

The dominant characters, corporate all, before the Court today include:
Transcontinental Gas Pipe Line Corporation (Transco) is a Delaware corporation doing business in Mississippi. Transco is an interstate pipeline company which purchases natural gas from fields in Texas, Louisiana and Mississippi and the federal off-shore domain. Transco transports this gas from these fields and sells it to customers along its pipeline which extends from southern Texas, through Mississippi, and up the east coast as far as New York. Transco was the principal Respondent before the Oil and Gas Board and is the Appellant here.
Coastal Exploration, Inc. (Coastal) is a Delaware corporation doing business in Mississippi. Coastal is a relatively small in-state oil and gas producer[1] and owns leasehold interests in gas-producing units in Mississippi. Coastal was the lead Petitioner below and is the lead Appellee here.
Tomlinson Interests, Inc. (Tomlinson) is a Texas corporation doing business in Mississippi. Tomlinson is an independent oil and gas producer which operates[2] one of the wells here involved. Tomlinson was one of two Respondents-turned-Petitioner below and is one of the Appellees here.
Getty Oil Company (Getty) is a Delaware corporation doing business in Mississippi. Getty is an oil and gas producer which operates three of the wells here involved. Getty was the other Respondent-turned-Petitioner below and is one of the Appellees here.
Supporting actors, all Petitioners before the Board, include:
Wiley Fairchild and Rodney Fairchild (Fairchilds) are adult resident citizens of Forrest County, Mississippi, each of whom owns an individual working interest in one of the wells here involved.
W.R. Fairchild Construction Company, Ltd. (Fairchilds) is a Mississippi corporation domiciled in Forrest County, Mississippi, and owns an undivided working interest in one of the wells here involved.
Susan W. Clements Lay (Lay) is an adult resident citizen of Hinds County, Mississippi, who owns an undivided working interest in one of the wells here involved.
Lane Petroleum Corporation (Lane) is a Mississippi corporation which owns an undivided working interest in one of the wells here involved.
Louis E. Ridgway, Jr., (Ridgway) is an adult resident citizen of Hinds County, Mississippi, who owns an undivided working interest in one of the wells here involved.
Daniel E. Herlihy (Herlihy) is an adult resident citizen of Hinds County, Mississippi, who owns an undivided working interest in one of the wells here involved.
Bryant M. Allen (Allen) is an adult resident citizen of Hinds County, Mississippi, who owns an undivided working interest in one of the wells here involved.
Inexco Oil Company (Inexco) is a Delaware corporation doing business in Mississippi. Inexco is a small interest owner in four wells here involved.
*1306 Of these supporting characters, only the Fairchilds and Inexco took any part in the formal hearing held by the State Oil and Gas Board, and only Inexco has entered its appearance and filed a brief before this Court. The others are listed because each filed with the Board an informal complaint charging Transco with failure to take ratably.
The State Oil and Gas Board (the Board) is a party to this appeal. The Board is an administrative agency of the State of Mississippi created by virtue of Chapter 256, Miss. Laws of 1948, now codified as Miss. Code Ann. § 53-1-5 (Supp. 1983), authorized, inter alia, to make and enforce reasonable rules, regulations and orders protecting against abuse of the correlative rights and opportunities of each owner of oil or gas in a common source of supply and charged with the conduct of hearings such as that held September 14-16, 1982, which has generated Order No. 409-82, the Circuit Court's affirmance of which is here under attack. The Board is an Appellee here.

B. The Drainage Phenomenon

At the core of this case is the geological phenomenon of drainage. That phenomenon has been described by this Court in Shell Oil Company v. James, 257 So.2d 488 (Miss. 1971).
When the pool of oil has been penetrated by a recovery well the oil and gas located in the pool move from a high pressure area to a low pressure area so that the oil and gas migrate from the property of one landowner to another. This exodus is called drainage. 257 So.2d at 494-495.
The phenomenon has been similarly described by the Supreme Court of Kansas in Northern Natural Gas Company v. State Corporation Commission, 188 Kan. 355, 362 P.2d 599 (1961):
While the members of this court make no claim to be experts in the science of the production of natural gas, we believe that the court may take judicial notice of the fact that where natural gas is within the earth in one common source and is under pressure, if one gas well is allowed to take gas, this will result in the pressure being lowered around the vicinity of this gas well so that the gas in the common source will tend to drain or rush to the vicinity of the well taking gas. The result will be that the other wells in the common field or source will be able to produce much less gas and the owners of such wells will have suffered a definite loss. 188 Kan. at 358, 362 P.2d at 602
In recognition of the relatively helpless position of the party whose gas is being drained, our law has moved to ameliorate the injustice produced by drainage. Such is the genesis of Statewide Rule 48 promulgated by the State Oil and Gas Board over 30 years ago on November 19, 1951. That rule provides
RULE 48. Ratable Take.
Each person now or hereafter engaged in the business of purchasing oil or gas from owners, operators, or producers shall purchase without discrimination in favor of one owner, operator, or producer against another in the same common source of supply.
Questions regarding the meaning, validity and enforceability of Rule 48 are at the center of this case.
Drainage has spawned much litigation in this state. All prior litigation appears to have arisen in the context of one owner of an undivided interest suing another such owner with the plaintiff claiming that the defendant was taking, i.e., draining, the plaintiff's gas. Shell Oil Company v. James, 257 So.2d 488, 490 (Miss. 1971); see generally, Comment, Implied Covenant To Protect Leased Premises From Drainage, Etc., 35 Miss.L.J. 280, 280-95 (1964) (basis for suits between individuals); Kuntz, Correlative Rights In Oil and Gas, 30 Miss.L.J. 1, 1-9 (1958) (same). Insofar as we can ascertain, this is the first time a court of this state has been called upon to consider Rule 48 or in any other context to grant relief against a purchaser of natural gas for drainage loss. See In re Petition of Cenard Oil and Gas Co., Docket No. *1307 60-64-92, Order No. 81-64, dated April 16, 1964, (Board cited Southern Natural Gas Co. for refusal to take ratably from owners of all interests in common source of supply; apparently order was not appealed). In this and other contexts, this action plows new furrows.

C. The Background Facts

Greens Creek Field and East Morgantown Field are two natural gas "fields"[3] located in Marion County, Mississippi. Greens Creek Field was discovered by the Harkins and Company  Board of Supervisors Well in 1976. The Harper Sand Gas Pool[4] of that field was first encountered by the Tomlinson Interests, Inc.  J.C. Williamson Well in 1978. Approximately 5 miles south of the J.C. Williamson Well, Tomlinson Interests, Inc. discovered East Morgantown Field, and its Harper Sand Gas Pool, with its Board of Education Well in March, 1979.[5]
These two fields had been defined as separate fields by the Board by late 1980. In 1980, Getty Oil Company discovered additional Harper Sand production directly between these two fields with its Rogers 28-11 Well No. 1.
We now know that the Harper Sand Gas Pool underlies portions of both the Greens Creek Field and the East Morgantown Field. The two fields are contiguous. If only one well were completed into this pool and natural gas were produced from the pool via that one well, the entire pool would eventually be drained.
At the time of the Board hearing in mid-September, 1982, there were at least six gas wells which had been completed into and which were producing from the Harper Sand Gas Pool: The Getty-Rogers 28-11 Well, the Getty-Sipp 20-9 Well, the Getty-Buckley 33-6 Well (all three operated by Getty), the Tomlinson-Willoughby 3-5 Well (operated by Tomlinson), and the Florida Exploration-Carlisle 4-2 Well and the Florida Exploration-Barnes 29-1 Well (both operated by Florida Exploration Company).
The Harper Sand Gas Pool produced by these wells lies below 15,000 feet. All of the wells producing from this pool have been classified as "deep, high-cost wells" under Section 107(c)(1) of the Natural Gas Policy Act of 1978 (NGPA); 15 U.S.C. § 3317(c)(1).
In 1978, Transco began contracting with producers in Greens Creek Field and, on the basis of those reserves thereby committed, extended its pipeline facilities to that field. When East Morgantown Field was discovered, Transco also began entering into contracts with producers and, as a result thereof, extended its pipeline facilities to those wells to recover the dedicated reserves. Transco entered into additional contracts with producers in 1980 to cover their production where the fields merged.
At the beginning of 1982, Transco had approximately thirty-five different contracts *1308 with various owners and producers in these two fields, including Getty and Tomlinson. These contracts had been made at various times between 1978 and 1982 and, because of different market conditions, had substantially different terms and conditions. Prior to July 1, 1982, Transco had not placed any restrictions on the contract owners and producers as to how much gas Transco would take under these contracts.
Coastal owns small undivided working interests (generally less than 1%) in the units of four of the wells which produce from this pool. These are the Rogers, Sipp, Willoughby and Barnes wells. Coastal participated in the drilling of each of these wells, paid its share of drilling and completion costs, and has paid its share of operating costs for each of these wells.
On August 6, 1980, Getty, as the operator and owner of a substantial working interest in the Getty-operated units, entered into a gas purchase contract with Transco. Among the terms of that contract was a price at the wellhead of $7.907 per one million British thermal units (mmbtu) of gas. When the wells in question first began producing gas in April 1981, beginning with production from the Sipp Well, the gas was sold to Transco.
Many owners (including Coastal) of small undivided interest in the Getty-operated wells had no gas purchase contract when first production began. However, Getty produced all owners' gas and delivered the gas to Transco which in turn purchased and paid for all gas at the same price and on the same terms and conditions as Transco purchased and paid Getty for its gas.
As the other wells completed into the pool began producing, the same procedure was followed, with the effect being that Transco took gas ratably as between the wells producing from the pool.
At the outset of the year 1982, Transco held contracts for the purchase of natural gas from these six wells at prices ranging from a low of $5.00 per mmbtu to a high of $9.054. A representative sampling of those contracts includes:

 Contract
 Number Date Seller(s) Price 
 06646 09/05/78 Tomlinson Interest, Inc. 6.511 + tax
 06690 12/12/78 Harkins & Company 9.054 + tax
 06695 12/12/78 First Energy Corporation "
 06696 12/12/78 St. Joe Petroleum (U.S.) "
 06707 12/12/78 Amerada Hess Corporation "
 06991 08/06/80 Getty Oil Company 7.907 + tax
 61008 08/22/80 Florida Exploration Company 8.4066 + tax
 61045 08/22/80 ACF Petroleum Company "
 61039 11/26/80 Southland Royalty Company 8.065 + tax
 61084 03/09/81 Jones O'Brien, Incorporated 8.161 + tax
 61218 12/01/81 Sabine Production Company 5.00
 61220 01.01.82 Sabine Production Company 5.00

In the spring of 1982, Transco began to experience problems in reselling the gas on its system. As the result of escalating gas costs and declining prices of competing fuel oil, end-use industrial customers of distribution companies served by Transco were switching from gas to cheaper fuel oils. By May of 1982, Transco had lost resale markets for approximately 95-100 million cubic feet of gas per day. Because the *1309 costs of gas were continuing to rise, Transco projected an additional $.65-$.70 per mmbtu increase in its average cost of gas and thus the inevitable loss of additional markets. Because it was experiencing market loss at its distribution end and was projecting further losses, Transco invoked the "market-out" provisions in all contracts containing those provisions and began paying those sellers $5.00 per mmbtu.
Coastal Exploration, Inc. had no contract with Transco. Coastal had elected to allow Getty, Florida Exploration, and Tomlinson, the operators of the wells in which it had an interest, to sell its share of gas "under the operating agreement".[6]
In May of 1982, Transco notified Getty and Tomlinson that effective June 1, 1982 (later changed to July 1, 1982), Transco would no longer take or purchase the gas of the "non-contract producers", those owners and producers who had not entered into a gas purchase contract with Transco. However, because of certain provisions of the Florida-Transco gas contract, Transco would continue to purchase non-contract producers' gas produced from the Florida-operated wells and pay those producers the same price Transco paid Florida.
After receiving this notice from Transco, Getty and Tomlinson notified Coastal that they, as operators, would not produce Coastal's share of gas from the Rogers, Sipp and Willoughby Wells unless Coastal obtained its own gas purchase contract. A similar type notice was sent to other non-contract producers and owners.
Following the notice from Getty and Tomlinson, Coastal attempted to secure another purchaser to whom it could sell its gas but was unsuccessful. In June of 1982, Coastal asked Transco to be allowed to ratify Getty's 1980 contract. Transco refused, unless Coastal would agree to amend the price to $5.00/mmbtu, to add a "market-out clause" (a clause which would allow Transco to adjust the purchase price if the contract price became "uneconomic"), and to nominate a seller's representative. Coastal rejected this offer, at which time Transco refused to take Coastal's gas at all. Coastal then filed its Petition asking the Board to require Transco to purchase its share of gas from the Getty operated wells under the same terms and conditions Transco was purchasing Getty's gas.
Transco did not want or need any more high cost gas because of its market situation. However, in July and August of 1982, it submitted the same offer that it had already made to Tomlinson and Coastal to all non-signatory producers and owners it knew about in Getty and Tomlinson operated wells. The only difference between the 1980 Getty contract and Transco's offer was the pricing provisions and the requirement that they nominate a single seller's representative for each well. At the time of the Board hearing, 55 non-signatory producers and owners in these wells had accepted Transco's offer.
*1310 The then-current market value of high cost gas in East Morgantown or Greens Creek Field was no more than what Transco had offered to the non-signatory producers and owners and was currently paying under its "market out" contracts, i.e., $5.00/mmbtu.[7]
Effective July 1, 1982, as to the Getty-Sipp and Rogers Wells, and effective August 19, 1982, as to the Tomlinson-Willoughby Well, Transco ceased to take gas attributable to the interests of any non-signatory producer or owner in the wells until and unless that producer or owner accepted Transco's $5.00 offer. As a result, Transco's takes of gas and the rates of production from the common pool by these wells were "cut back" to below the maximum efficient rate of flow of the wells.[8] Thereafter, for all practical purposes, the wells produced only and Transco purchased only a rate of production equal to the operators' and other signatory producers' and owners' interests in the maximum efficient rate of flow from the wells.
The situation at the Florida-Carlisle and Barnes Wells, was different, and significantly so. Transco continued to purchase the non-signatory producers' and owners' gas which was produced from these two wells and tendered to Transco by Florida, the operator, on the same terms and conditions and at the same price which Transco paid for Florida's gas. Thus, while the Sipp, Rogers and Willoughby Wells were cut-back to below their respective allowables because of Transco's refusal to take and purchase gas, the Barnes and Carlisle Wells continued to be produced at their respective allowables because of Transco's takes and purchases of gas from those wells.
The result of Transco's actions has been and, if allowed to continue, will be non-uniform, disproportionate and unratable withdrawals of gas from the common pool causing undue drainage between tracts of land, that is, drainage and undue drainage from the Getty and Tomlinson operated units to the Florida operated units producing from the common pool. The result of Transco's actions has also been and, if allowed to continue, will be one or more owners in the common pool producing more than their just and equitable share of the production from the pool.
There is a second form of loss to which the nonsignatory producers and owners will be potentially subject as a result of Transco's actions. If Transco continues to take only the gas it is contractually obligated to take, the remaining gas, though still in the pool, will be much more difficult to retrieve. This is because the pressure in the pool will lower as gas is produced. In this way contracting owners such as Getty will be able to produce more than their just and equitable share of the production from the pool, absent, of course, enforcement of a requirement that contracting owners produce all owners' gas ratably.
It should be noted that Transco was not the only pipeline purchasing gas produced by these wells. Tennessee Gas Pipe Line Co. was also a market outlet for the various owners. The relative percentages in each well under contract first to Transco, then to Tennessee, as well as the interests not under contract are shown on the following table.

*1311
 PERCENTAGE GAS REPRESENTED TO BE DEDICATED
 UNDER GAS PURCHASE CONTRACT 
 WI Owners Who
 Refused to Sell
 To Transco &
 Who Are Still
 Transco Tennessee Uncommitted Balance
Rogers 28-11 45.27489% (14) 2.35040% (8) 33.65260% (2) 18.72211%
 (Getty)
Sipp 20-9 70.28732% (33) 9.38427% (17) 11.54930% (1) 8.77911%
 (Getty)
Willoughby 3-5 53.14003% (11) 3.40061% (6) 25.66083% (11) 17.79853%
 (Tomlinson)
Buckley 33-6 79.95812% (6) 11.34146% (3) -0- (0) 8.70042%
 (Getty)
Carlisle 4-2 63.30590% (4) 29.61460% (9) 1.56250% (1) 5.51700%
 (Florida)
Barnes 29-1 65.14900% (4) 11.61600% (11) -0- (0) 23.23500%
 (Florida)

As of the Board hearing in mid-September of 1982, Tennessee was not taking any gas from these six wells. Tennessee had also refused to purchase Coastal's gas. Apparently, Tennessee viewed its market position as Transco did its.

D. Proceedings Below

On July 29, 1982, Coastal commenced these proceedings by filing its petition with the State Oil & Gas Board. Coastal asked that Transco be required to comply with Statewide Rule 48 by ratably taking gas from the wells producing from the common pool and purchasing without discrimination in favor of the operators, Getty and Tomlinson, against Coastal.
The Fairchilds, owners in the Rogers 28-11 Well, joined in the Petition.
At the hearing before the Board in mid-September 1982, Transco claimed that Statewide Rule 48 was invalid as a matter of state law and that Board had no authority to require Transco to ratably take or purchase without discrimination. Transco argued that federal law had preempted the area and that Rule 48 was unconstitutional for a variety of reasons.
A three day trial was held before the Board during which Transco defended the action by the presentation of witnesses, exhibits and legal arguments, raising as defenses the same claims which it is now asserting before this Court.
On October 13, 1982, the Board ruled in favor of the producers and by its Order No. 409-82 directed Transco to,
comply with Statewide Rule 48 of the State Oil and Gas Board of Mississippi in its purchases of gas from the East Harper Sand Gas Pool in Greens Creek and East Morgantown Fields and ... ratably take and purchase gas without discrimination in favor of one owner, operator or producer against another in the said common source of [sic] pool; and, specifically, in the event it so chooses and elects to take and purchase gas from said common pool, Transco shall ratably take and purchase without discrimination in favor of the operators, Getty and Tomlinson against Coastal, the Fairchilds, and Inexco.
Transco, employing Miss. Code Ann. § 53-1-39 (Supp. 1983), appealed to the Circuit Court of the First Judicial District of Hinds County, Mississippi, which on June 28, 1983, released a thorough and competent opinion affirming Order No. 409-82 in *1312 its entirety. This appeal has followed. See Miss. Code Ann. § 53-1-45 (Supp. 1983).

E. The "Non-Facts"

Before considering the various questions tendered on this appeal, three red herrings need to be disposed of. The facts of this case have been argued as vigorously as the law. Perhaps because much is at stake the parties with more than occasional frequency have reminded us of facts which are of no legal significance. These "non-facts" are identified here.
First, nothing here turns on size. That Transco and Getty may be large corporations and that Coastal may be a small corporation simply does not matter. The size of the interest of a party in the various wells is likewise irrelevant. Each party before this Court today stands equal to each other in justice-worthiness.
Second, nothing turns on the domicile of the parties. That some are Mississippians and some are not is of no significance. Today we apply controlling principles of law to relevant facts  and whether a party is Mississippi-based is not among those relevant facts.
Third, the economic consequence of today's decision for one or more of the parties is of no significance, except insofar as the law has provided otherwise. For example, drainage is of serious economic consequence if it occurs and applicable rules of law have given some of these parties protections from it. On the other hand, we have given no thought to whether Transco can sell all the gas it is lawfully required to take, only to the articulation of how much gas Transco is lawfully required to take. Similarly, we have no concern that some non-contract interest owners in the wells in issue may not obtain the return on investment they once expected.
Holmes put the point well in The Path of The Law, 10 Harv.L.Rev. 457 (1897)
The reason why a lawyer does not mention that his client wore a white hat when he made a contract, while Mrs. Quickly would be sure to dwell upon it along with parcel gilt goblet and the sea-coal fire, is that he forsees that the public force will act in the same way whatever his client had upon his head. 10 Harv.L.Rev. at 458.
As former lawyers not wanting to appear as Mrs. Quicklys, we advise one and all that the size of the parties and their interests, their states of domicile, and the economic consequences to them of today's decision are of no relevance to our determination how the public force ought act on them.

III. Scope of Judicial Review

We note at the outset the well-settled scope of judicial review of an order of the Oil & Gas Board. The question before the reviewing court is
whether the order is supported by substantial evidence, is arbitrary or capricious, beyond the power of the Board to make, or violates some constitutional right of the complaining party.
California Co. v. State Oil & Gas Board, 200 Miss. 824, 842, 27 So.2d 542, 546 (1946); Damson Oil Corp. v. Southeastern Oil Co., 370 So.2d 225, 229 (Miss. 1979) (quoting California Co.); Masonite Corp. v. State Oil & Gas Board, 240 So.2d 446, 448 (Miss. 1970) (same); Superior Oil Co. v. State Oil & Gas Board, 220 So.2d 602, 603 (Miss. 1969) (same).
The findings of an administrative agency like the Board are prima facie correct and the reviewing court may not substitute its judgment for that of the administrative agency where there is a substantial basis in the evidence for those findings. Barnwell, Inc. v. Sun Oil Co., 249 Miss. 398, 410-11, 162 So.2d 635, 640 (1964); State Oil & Gas Board of Mississippi v. Brinkley, 329 So.2d 512, 515-516 (Miss. 1976); Masonite Corp. v. State Oil and Gas Board, 240 So.2d 446, 448 (Miss. 1970); Damson Oil Corp. v. Southeastern Oil Co., 370 So.2d 225, 229 (Miss. 1979).
Well within our authority is a plenary consideration of the claims tendered by *1313 Transco based in federal constitutional law, to wit: the claims that Rule 48 and Order No. 409-82 contravene the Supremacy Clause, the Commerce Clause and the Due Process Clause of the United States Constitution.
Also well within our review authority is a consideration of the question whether Rule 48 or Order No. 409-82, or any part of either, transcends the authority vested by the Mississippi Legislature in the State Oil and Gas Board and is thus beyond the lawful power of the Board to make. Where we find such a transcension, it becomes our responsibility and obligation to declare the offensive portion of the rule or order invalid and unenforceable.

IV. Transco's Claims Under Federal Law

A. Federal Preemption

The initial thrust of Transco's appeal is that this state's authority to make and enforce a law such as Rule 48 has been effectively preempted by the United States. In Assignment of Error No. 3, Transco says that this preemption has occurred by virtue of the so-called negative Commerce Clause, that long established construction of the Commerce Clause of the Constitution of the United States which limits the authority of the states to enforce unreasonable burdens on interstate commerce. Complementing that argument is the one we consider now, made under Assignment of Error No. 2, to the effect that the Congress, in the exercise of its powers affirmatively granted under the Commerce Clause, has preempted state regulation by virtue of the Natural Gas Act, 15 U.S.C. §§ 717-717w, and the Natural Gas Policy Act of 1978, Pub.L. No. 95-621, 92 Stat. 3352 (1978), codified at 15 U.S.C. §§ 3301 et seq., and the authority and responsibilities vested thereby in the Federal Energy Regulatory Commission (FERC).
The Supremacy Clause of the Constitution of the United States provides that all valid enactments of the Congress shall be the supreme law of the land
and the Judges of every state shall be bound thereby, anything in the Constitution or Laws of any State to the contrary notwithstanding.
U.S. Const. art. VI, § 2.
From this source has sprung the doctrine of federal preemption of state law. Federal law has preemptive effective when the Congress acting within its constitutional powers expressly so provides. Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. 375, 385, 386, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1, 13-16 (1983); Fidelity Federal Savings and Loan Association. v. De La Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664, 674-75 (1982); Jones v. Rath Packing Co., 430 U.S. 519, 525-526, 97 S.Ct. 1305, 1309-1310, 51 L.Ed.2d 604, 613-14 (1977). This Court has respected the preemptive effect of such enactments. See, e.g., International Association of Bridge, Structural & Ornamental Iron-workers, AFL-CIO Local Union No. 710 v. Howard L. Byrd Building Service, Inc., 284 So.2d 301, 302-303 (Miss. 1973) (federal labor law preempts); Hattiesburg Building & Construction Trades Council v. Mississippi Mechanical Contractors, Inc., 207 So.2d 99, 102-103 (Miss. 1968) (same).
It is now well recognized that state law may be preempted even in the absence of an express congressional enactment to that effect. This view has recently been articulated in Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), as follows:
"Absent explicit preemptive language, Congress' intent to supersede state law altogether may be found from a `scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' `because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or `because the object sought to *1314 be obtained by federal law and the character of obligations imposed by it may reveal the same purpose.' [Citations omitted] Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law. Such a conflict arises when `compliance with both federal and state regulations is a physical impossibility,' [Citations omitted] or where state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"
461 U.S. at 203-204, 103 S.Ct. at 1722, 75 L.Ed.2d at 765; Exxon Corp. v. Eagerton, 462 U.S. 176, ___, 103 S.Ct. 2296, 2301, 76 L.Ed.2d 497, 505 (1983); see Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. 375, 383-385, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1, 14-16 (1983) (decision not to regulate can be as preemptive as one to regulate).
The State Oil and Gas Board has attempted to achieve equity and protect owners in a common pool from loss through drainage by the promulgation and enforcement of a rule requiring purchasers at the wellhead to take ratably. Transco, however, argues that Rule 48 as construed and interpreted in Order No. 409-82 regulates an aspect of natural gas production exclusive regulatory jurisdiction over which has been vested by the Congress in FERC. State power, accordingly, has been preempted and, Transco argues, the Circuit Court erred in failing to so hold.
We consider Transco's affirmative preemption claim against the backdrop of our confidence that the State of Mississippi has the authority to regulate the production of natural gas from pools or fields situated within this state. Superior Oil Co. v. Foote, 214 Miss. 857, 874-878, 59 So.2d 85, 92-94 (1952). After all, such production is essentially an intra-state (intra-Mississippi) activity. This authority has, generally speaking, been delegated to the State Oil and Gas Board, and constitutionally so. Barnwell, Inc. v. Sun Oil Co., 249 Miss. 398, 406, 162 So.2d 635, 638 (1964). We are concerned here with an authority this state has lest it be preempted by paramount authority emanating from another sovereign, the United States of America. Cities Service Gas Company v. Peerless Oil and Gas Company, 340 U.S. 179, 186-87, 71 S.Ct. 215, 219-20, 95 L.Ed. 190, 202 (1950).
All parties agree that prior to 1978 there existed in the Federal Energy Regulatory Commission (formerly the Federal Power Commission) plenary authority to regulate the sale and transportation of natural gas in interstate commerce. No one questions that prior to 1978 this federal authority within its sphere was more than sufficient to preempt any otherwise lawful state authority. Northern Natural Gas Co. v. State Corporation Commission of Kansas, 372 U.S. 84, 89-90, 83 S.Ct. 646, 649, 9 L.Ed.2d 601, 606 (1963). Prior to 1978 this state's authority to enforce Rule 48 requiring ratable taking had been effectively suspended  preempted, if you will, and any orders such as Order No. 409-82 would have been wholly unenforceable.
In 1978 the Congress enacted and the President signed into law the Natural Gas Policy Act of 1978 (NGPA). 15 U.S.C. §§ 3301, et seq. Transco emphasizes that by virtue of this enactment the Congress extended federal regulation to intrastate gas. This was done to eliminate price discrepancies then existing between intrastate and interstate markets which were encouraging producers to withhold new supplies of gas from the heavily regulated interstate market.
Coastal and the other producers, on the other hand, remind us that the Congress also coupled with that extension of regulation a comprehensive plan of deregulation under which some gas was immediately deregulated, other gas was more gradually deregulated, and regulated gas prices were allowed to escalate, all in order to provide producers, operators and pipeline purchasers with the degree of freedom from regulation and the price incentives necessary to encourage discovery and production of *1315 more gas and thus alleviate the theretofore seemingly perpetual natural gas shortage.[9] We are here concerned only with deregulated natural gas.
The Congress specifically found that, under the old Natural Gas Act, FERC (formerly FPC) had kept "just and reasonable" wellhead sales prices of gas artificially low and had imposed a regulatory maze upon such sales so that production for sale in the interstate market was effectively deterred, all contrary to the national interest in having ready access to an adequate supply of natural gas. Tenneco, Inc. v. Sutton, 530 F. Supp. 411, 420 (M.D.La. 1981).
However important the congressional policy and context may be, our precise question today is whether  following enactment of NGPA  federal preemption (with respect to deregulated high cost gas) which undoubtedly existed theretofore continued. Transco argues vigorously that FERC jurisdiction still exists (although in altered form), and that preemption under Northern Natural remains the order of the day. Coastal and the other producers candidly pose the issue
"We will not mince words: if the "first sale" (the wellhead sale) of deregulated gas continues to be subject to FERC's jurisdiction under Section 1(b) of the NGA, then Northern Natural applies to this case and Order No. 409-82 is invalid."
 (Brief of Coastal Exploration, Inc., served November 29, 1983, at 22)
Northern Natural held invalid a ratable take order which the Kansas Corporation Commission had entered against an interstate pipeline company. The basis of the decision was the state's invasion of the FPC's exclusive regulatory jurisdiction under Section 1(b) of the Natural Gas Act of 1938:
"We disagree with the Kansas Supreme Court, for we hold that the State Commission's orders did invade the exclusive jurisdiction which the Natural Gas Act has conferred upon the Federal Power Commission over the sale and transportation of natural gas in interstate commerce for resale."
 372 U.S. at 89, 83 S.Ct. at 649, 9 L.Ed.2d at 606.
*1316 It is our reading of the Natural Gas Policy Act of 1978 that wellhead sales of the sort of gas with which we are here concerned have been effectively deregulated. We are concerned here with high cost natural gas, 15 U.S.C. § 3317(c)(1), which as a matter of law is no longer subject to FERC (formerly FPC) jurisdiction. 15 U.S.C. § 3431(a)(1)(B)(i). Congress has declared that the first sale of deregulated gas is never made subject to the Natural Gas Act or to FERC's jurisdiction under that act, and "dedicated gas" which is determined to be deregulated gas ceases to be subject to the NGA or FERC's jurisdiction under the NGA. With respect to this category of gas, the regulatory situation existing at the time Northern Natural was decided has thus been altered radically.
NGPA Section 601(a)(1)(A), (B) and (D), 15 U.S.C. § 3431(a)(1)(A), (B) and (D), provide as follows:

SECTION 601. COORDINATION WITH THE NATURAL GAS ACT 
(a) JURISDICTION OF THE COMMISSION UNDER THE NATURAL GAS ACT. 
(1) SALES. 
(A) NATURAL GAS NOT COMMITTED OR DEDICATED  For purposes of section 1(b) of the Natural Gas Act, effective on the first day of the first month beginning after the date of the enactment of this Act, the provisions of the Natural Gas Act and the jurisdiction of the Commission under such shall not apply to natural gas which was not committed or dedicated to interstate commerce as of the day before the date of the enactment of this Act solely by reason of any first sale of such natural gas.
(B) COMMITTED OR DEDICATED NATURAL GAS  Effective beginning on the first day of the first month beginning after the date of the enactment of this Act, for purposes of section 1(b) of the Natural Gas Act, the provisions of such Act and the jurisdiction of the Commission under such Act shall not apply solely by reason of any first sale of natural gas which is committed or dedicated to interstate commerce as of the day before the date of the enactment of this Act and which is 
(i) High-cost natural gas (as defined in Section 107(c)(1), (2), (3), or (4) of this Act); [Emphasis added].
The "Joint Explanatory Statement of the Committee on Conference" of the Congress, which accompanied the NGPA, makes clear what the conferees intended that Section 601(a)(1) accomplish.
"The Conference Agreement limits the jurisdiction of the Commission under the Natural Gas Act in a manner similar to the House-passed bill. Natural gas not committed or dedicated to interstate commerce as of the day before the date of the enactment of this Act is never made subject to the Commission's jurisdiction under sec. 1(b) of the Natural Gas Act. The Commission's jurisdiction under section 1(b) of the Natural Gas Act ceases on the first day of the first month beginning after the date of enactment of this Act for the following categories of natural gas: High-cost natural gas which qualifies for deregulated price treatment under section 107(c)(1), (2), (3), or (4); [Emphasis added].
* * * * * *
Section 601(a)(1) [15 U.S.C. § 3431(a)(1)] means what it says  the Natural Gas Act of 1938 (NGA) and FERC's jurisdiction under the Act never apply to deregulated gas, and certain other categories of gas. That message is decisive of the preemption issue in this case. The reason the Supreme Court voided the ratable take order in Northern Natural was because at that particular point in time such an order substantially affected gas which was subject to the FPC's (FERC's) jurisdiction under the NGA. If the NGA and FERC's jurisdiction under the NGA no longer extend to deregulated gas, and FERC has no authority to regulate the first sales and purchases of deregulated gas either *1317 directly or indirectly, then Northern Natural does not dictate a preemption of otherwise existing state authority.
We are not unmindful of the fact that FERC still has the authority to determine whether pipelines such as Transco may "pass through" the prices they pay at the wellhead, although pass through may be denied only where FERC "determines that the amount paid [by the pipeline] was excessive due to fraud, abuse or similar grounds". 15 U.S.C. § 3431(c)(2). Transco cites this continuing pass through approval authority and urges that FERC jurisdiction continues, only FERC now regulates by reference to a "fraud and collusion" standard as distinguished from the old "just and reasonable" standard. A change in the standard, Transco argues, does not alter the de jure existence of jurisdiction the effect of which is preemption.
The argument is disingenuous. FERC to be sure has today authority to prohibit a pipeline from passing through to consumers excessive wellhead prices paid producers as a result of some nefarious scheme to defraud a consumer. But FERC has no authority to intervene when the pipeline, denied pass through, seeks to get out of its deal with the producers. Though the price paid at the wellhead may well be FERC-determined excessive as the product of fraud or collusion when pass through is sought, it remains a just and reasonable price as a matter of law as between the pipeline and the producer. 15 U.S.C. § 3431(b)(1)(A). Nothing in the pass through provisions of NGPA continues in effect any FERC jurisdiction over wellhead first sales of deregulated natural gas.
Our review of the congressional enactments discloses no explicit preemptive language. Our comparison of Rule 48 with federal law reveals no point of actual conflict. Transco's compliance with Rule 48 would not cause it to act in violation of the spirit or letter of any federal law. Finally, we find nothing in federal law as modified by NGPA which leaves in place a "scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it". Fidelity Federal Savings & Loan Assn. v. De La Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982). As presently constituted federal law fails to generate any spirit, policy or rule with which a natural gas producing state would collide if it sought to do equity between and among owners in a common pool of deregulated gas by the promulgation or enforcement of a common purchaser or ratable take rule.
Our conclusion that federal jurisdiction and regulation, both the expressed and implicit varieties, have been withdrawn does not ipso facto leave the state free to reenter, for
"a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate."
 Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. at 384, 103 S.Ct. at 1912, 76 L.Ed.2d at 10 (emphasis in original).
This notion must be taken seriously here. Our context is a congressional fact finding that regulation and price controls, however well intended, have had an effect contrary to the national interest.[10] The Congress has found that regulation of the sale and transportation of natural gas in interstate commerce has had the effect of stifling production for the interstate market. The Congress determined that the national interest would be served in the long run by a different approach, that first sales  wellhead sales  should be deregulated and that *1318 the inevitably increased cost of production should be borne by the consumer.
In this context, the Congress certainly had the authority to enact not only a federal plan of deregulation of first sales but also that these sales should be free of state regulation. If federal regulation produces evils inimicable to the national interest, a plethora of state regulations varying from jurisdiction to jurisdiction seems equally capable.
Our study of the terms and provisions of the Natural Gas Policy Act of 1978, however, convinces us that the Congress has not proscribed state regulation of wellhead sales of deregulated gas. However consistent a continued proscription on state regulation might have been with the theoretical underpinnings of deregulation, the Congress in NGPA in 1978 did not ban state regulation of deregulated gas. What, and all, the Congress has done insofar as we are concerned is strip away federal regulatory authority thus leaving in effect and wholly exercisable such state regulatory authority as otherwise exists. The lynchpin that holds Northern Natural together having been removed, and not having not been replaced by a congressional enactment that wellhead prices of deregulated gas be left unregulated by the states as well, Transco's preemption claim fails. The states today have the authority to require that an interstate pipeline company take deregulated gas ratably and without discrimination in favor of one owner, operator or producer and against another in the same common source of supply. Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 185, 71 S.Ct. 215, 219, 95 L.Ed. 190, 201 (1950). Transco's Assignment of Error No. 2 is denied.
A caveat: Today's facts and today's holding concern "deregulated gas". The Harper Sand Gas Pool lies at a depth of more than 15,000 feet below the surface of the earth. The wells in issue produce "highcost natural gas", 15 U.S.C. § 3317(c)(1), with respect to the wellhead sales pricing of which FERC has no jurisdiction. 15 U.S.C. § 3431(a)(1)(B)(i). The first sales of many other categories of natural gas remain subject to FERC jurisdiction and regulation according to NGPA. Nothing said here, of course, can decide any preemption question that may hereafter arise in the context of regulated natural gas produced in this state.

B. The Negative Commerce Clause

By virtue of the Constitution's having vested the Congress of the United States with the power to regulate commerce among the states, U.S. Const., art. I, § 8, cl. 3, Transco argues via Assignment of Error No. 3 that the State of Mississippi is without authority to enforce Rule 48 as interpreted in Order No. 409-82 because it creates an impermissible burden on interstate commerce.
Grammatically speaking, the Commerce Clause is an affirmative grant of power to the Congress. A century and a half of constitutional decisional jurisprudence, traceable to a dictum by Chief Justice Marshall in Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 209, 6 L.Ed. 23, 73 (1824), have established the legitimacy and reality of the negative Commerce Clause. Even in the absence of exercise by the Congress of its power to regulate commerce, the clause stands as a barrier to the enforcement by the states of laws, statutes or regulations which unreasonably discriminate in favor of in-state interests.
The values undergirding the negative Commerce Clause were articulated by Justice Robert H. Jackson on H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949).
"Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any."

*1319  336 U.S. at 539, 69 S.Ct. at 665, 93 L.Ed. at 875.
The Commerce Clause is said to create a national common market. Individual business entities are free to operate commercially in any state where such operations are legal and may not be denied access to markets or resources based upon that choice. Conversely, a buyer's state of origin generally should not affect his access to goods produced anywhere in the country. The states are without authority to enforce laws imposing substantial burdens on such consumer. South-Central Timber and Development, Inc. v. Wunnicke, ___ U.S. ___, ___, 104 S.Ct. 2237, 2247, 81 L.Ed.2d 71, 76 (1984); Hughes v. Oklahoma, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250, 255-56 (1979); H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 534-538, 69 S.Ct. 657, 663-64, 93 L.Ed. 865, 872-74 (1949); Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996, 1004-05 (1851).
Any regulation of a business enterprise engaged in interstate commerce has some effect on commerce among the states. This is undoubtedly so in the case of Rule 48 and Order No. 409-82. The question is not whether the state's regulations impose a burden on interstate commerce but whether the burden which is imposed is a constitutionally impermissible one.
Just how much of a burden upon interstate commerce must be found before a state runs afoul of the negative Commerce Clause has been a subject of long debate and varying answers by the Supreme Court. This has particularly been so in the past decade or so as the Supreme Court has muddled its way along through the quagmire of a conceptually pleasing but practicably nightmarish (at least from the point of view of achieving rationally consistent results from case to case and thus affording the needed tools to states and citizens concerned with predictability) balancing of interests test first announced in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). In Pike the Supreme Court articulated what has become the contemporary formulation of the negative Commerce Clause as applied to a state's attempt to regulate interstate commerce.
"Although the criteria for determining the validity of state statutes [regulations, rules or orders] affecting interstate commerce have variously stated, the general rule that emerges can be phrased as follows: where the statute [regulation, rule or order] regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [citation ommitted] If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate commerce."
 397 U.S. at 142, 90 S.Ct. at 847, 25 L.Ed.2d at 178-79.
We have been authoritatively instructed in this formulation of the negative Commerce Clause in Great Atlantic and Pacific Tea Co. v. Cottrell, 424 U.S. 366, 371-372, 96 S.Ct. 923, 928, 47 L.Ed.2d 55, 61 (1976). In that case the Supreme Court, reversing a decision of this Court, applied the balancing of interests test and invalidated a Mississippi restriction on the sale of milk as this state had sought to enforce it against a Louisiana milk producer.
A review of the dozens of decisions since Pike v. Bruce Church, wherein the established formulation has been rotely recited, produces little in the way of doctrinal consistency or easily rationalized results. Just what is "a legitimate public purpose" and how much of one need exist before a state regulation will be sustained seems almost to depend on who is doing the looking and what that justice had for breakfast on the day of decision; the same with whether the inevitable burden on interstate commerce is "only incidental" or is "clearly excessive".
*1320 In the first years of litigation under the new balancing test, the Supreme Court seemed relatively easily satisfied that a burden was excessive and relatively hard to convince that the state did not have a nondiscriminatory alternative adequate to protect local interests. See Hughes v. Oklahoma, 441 U.S. 322, 339, 99 S.Ct. 1727, 1737-38, 60 L.Ed.2d 250, 263 (1979) (statute invalid that forbid export of minnows); Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446-47, 53 L.Ed.2d 383, 400-01 (1977) (statute invalid that mandated apples be ungraded); Great Atlantic and Pacific Tea Co. v. Cottrell, 424 U.S. at 377, 96 S.Ct. at 931-31, 47 L.Ed.2d at 64 (1976) (Mississippi statute invalid that prohibits importing milk from another state unless that state allows Mississippi milk to be imported).
More recent cases give the states wider berth. See, e.g., Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. 375, 393-396, 103 S.Ct. 1905, 1917-18, 76 L.Ed.2d 1, 16-18 (1983) (state commission could govern wholesale electric rates); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471-73, 101 S.Ct. 715, 727-29, 66 L.Ed.2d 659, 673-75 (1981) (state could ban sale of milk in plastic containers); Reeves, Inc. v. Stake, 447 U.S. 429, 443-47, 100 S.Ct. 2271, 2281-82, 65 L.Ed.2d 244, 255-57 (1980) (state could limit sale of state-owned cement to residents); Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127-29, 98 S.Ct. 2207, 2214-15, 57 L.Ed.2d 91, 101-02 (1978) (state could mandate that oil producers not own retail outlets). The same permissive trend is also discernible in recent state taxation of interstate commerce cases, arguably decided via a different doctrinal formulation. See, e.g., Commonwealth Edison v. Montana, 453 U.S. 609, 624-29, 101 S.Ct. 2946, 2957-59, 69 L.Ed.2d 884, 898-902 (1981) (state could place exorbitant severance tax on coal); Complete Auto Transit Co. v. Brady, 430 U.S. 274, 288-89, 97 S.Ct. 1076, 1083-84, 51 L.Ed.2d 326, 336-37 (1977) (upholding a tax imposed by this state against an interstate trucking company for the privilege of doing business within this state).
One concern arising from the ad hoc interpretation of the negative Commerce Clause is the authoritative effect of pre-Pike decisions. We express this concern in the context of Transco's insistence that one of the burdens upon interstate commerce created by the rule and order here in issue is increased prices to the consumer. Pre-Pike decisions, however, establish that increased prices or decreased supplies to consumers in other states do not necessarily render a state's regulation unconstitutional. Cities Service Gas Co. v. Peerless Oil and Gas Co., 340 U.S. 179, 186-87, 71 S.Ct. 215, 219-20, 95 L.Ed. 190, 202-03 (1950) (state could order pipeline to ratably take sellers gas at fixed price); Parker v. Brown, 317 U.S. 341, 368, 63 S.Ct. 307, 322, 87 L.Ed. 315, 335-36 (1943) (state could control raisin marketing); and Milk Control Board v. Eisenberg Farm Products, 306 U.S. 346, 352-353, 59 S.Ct. 528, 530-31, 83 L.Ed. 752, 756-57 (1939) (state could set minimum price paid to milk producers). With some temerity, we assume that the premise derived from these cases is still good law.
In this context, Pike v. Bruce Church, Inc. directs that we proceed to a consideration of what legitimate local interests may be said to undergird and be promoted by Rule 48 and Order No. 409-82.
Coastal, Getty and the other producers argue that conservation of an important natural resource and the prevention of waste are implicated. Without doubt, if this were so, such would be a legitimate local interest entitled to great weight and consideration in the Commerce Clause balancing test. It is difficult, however, for us to see how there is waste of natural resources when an interstate pipe line company refuses to take ratably or otherwise. Waste would seem to follow from taking too much, not too little.
We are aware of the statutory definition of waste. Miss. Code Ann. § 53-1-3(k) (Supp. 1983). How our Legislature defines waste for purposes of the Mississippi *1321 Conservation Act, of course, is its prerogative. Compare Stong, Administratrix v. Freeman Truck Line, Inc., 456 So.2d 698, 709 (Miss. 1984); McLaurin v. Mississippi Employment Security Commission, 435 So.2d 1170, 1171-1172 (Miss. 1983). Its definition, of course, is in no way controlling for purposes of analysis under the Commerce Clause of the Constitution of the United States.
The true and entirely legitimate local interest here implicated is fairness. Rule 48 is a rule of equity. The drainage phenomenon is a fact of life of natural gas production. Shell Oil Company v. James, 257 So.2d 488, 494-495 (Miss. 1971). The state through its Oil and Gas Board has acted in this and other ways to assure equity and fairness between and among the varying interests in a common source of supply. See Phillips Petroleum Co. v. Millette, 221 Miss. 1, 15-17, 72 So.2d 176, 179 (1954) (protection against loss through drainage required by fundamental notions of equity and justice).
We regard fairness as among the more noble purposes of the state. It is a fundamental component of the idea of justice. Rawls, A Theory of Justice (1971). That we are concerned here with the distribution of material and highly valuable resources does not denigrate or render less noble the state's duty to assure fairness between all persons affected. A laudable feature of Rule 48 in the present context is that it applies to owners of interests in the common source of supply without reference to whether they be Mississippians. Getty is entitled to the same fair treatment as is Coastal as are the Fairchilds as is Tomlinson and as is Inexco and so forth.
Transco argues that the principal burden upon interstate commerce resulting from Rule 48 and Order No. 409-82 is higher prices to the ultimate purchasers and consumers of natural gas. The argument is not persuasive.
First, as indicated above, we believe the proposition well-established that higher prices to consumers in another state do not render a state's regulation of commerce impermissible per se under the negative Commerce Clause. Cities Service Company v. Peerless Oil and Gas Co., 340 U.S. 179, 186-87, 71 S.Ct. 215, 219-20, 95 L.Ed. 190, 202-03 (1950); Parker v. Brown, 317 U.S. 341, 368, 63 S.Ct. 307, 322, 87 L.Ed. 315, 335-36 (1943); Milk Control Board v. Eisenberg, 306 U.S. 346, 352-353, 59 S.Ct. 528, 530-31, 83 L.Ed. 752, 756-57 (1939).
Second, the Congress has declared that all reasonable costs of production of natural gas shall be borne ultimately by the consumer. This is one of the fundamental policy determinations underlying the Natural Gas Policy Act of 1978. Indeed, it was assumed by Congress that prices to the consumer would increase. This was found preferable to the pre-existing price controls and regulatory policies of FERC under the pre-1978 Natural Gas Act. Thus, whether increased prices to consumers may be fairly characterized as an incidental burden upon interstate commerce, we find it persuasive that Congress within the scope of its power under the affirmative Commerce Clause has expressly authorized such increases.
Transco further argues that there is a burden on interstate commerce emanating from Rule 48 in that compliance with Order No. 409-82 will require that more natural gas be taken from Mississippi and less from Louisiana and Texas. The quick answer is that Louisiana and Texas also have ratable take regulations in effect.[11] Furthermore, no evidence has been adduced which would lend credence to Transco's argument that Rule 48 impermissibly discriminates *1322 against natural gas production in Louisiana and Texas.
The fundamental flaw in Transco's reasoning on the burden point is that it seems to be talking much more about a burden upon Transco than a burden upon interstate commerce. The burden upon Transco appears traceable to its contract with Getty, not to Rule 48. That contract is one Transco freely and voluntarily entered with Getty. It is hard to see how a ratable take rule or order could be said to generate an unreasonable burden on interstate commerce when the only thing requiring Transco (or any other interstate pipeline) to take at all, ratably or otherwise, is its own contract.
Many important provisions of that contract reflect that the parties carefully considered future eventualities. The so-called take-or-pay provision obligating Transco to pay whether it takes the production made available by Getty is one such clause. Transco's problem is that it failed to protect itself against the market glut and declining prices consumers are willing to pay for natural gas. It is not now and never has been the function of this Court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated. Bunting v. Orendorf, 152 Miss. 327, 332, 120 So. 182, 183 (1929); Jemison v. McDaniel, 25 Miss. 83, 86 (1852); Gulf Oil Corp. v. Federal Power Commission, 563 F.2d 588, 598-600 (3d Cir.1977).
Not only did Transco freely and voluntarily  and no doubt in anticipation of accomplishing its own advantage  enter into the contract with Getty in 1980, it did so against the backdrop of Rule 48. One Transco official admitted actual knowledge of Rule 48. In any event, an interstate pipeline such as Transco is chargeable with full knowledge of Rule 48 and any other applicable state regulations (or statutes, laws, etc.) existing at the time of contracting. The parties contract against the backdrop of regulation and ought generally be held to an implied incorporation of applicable regulations into the contract.
Transco's argument that Rule 48 had never been enforced is lame indeed. Transco knew of the existence of the rule or was certainly charged with knowledge of its existence; the rule has been on the books since 1952. Despite the arguments made here, Transco was chargeable with knowledge that the states became entitled to play a greater role in regulation of the production of deregulated natural gas following enactment of the Natural Gas Policy Act in 1978. More fundamentally, Transco was certainly aware of the drainage problem inherent in natural gas production when there are two or more wells producing from a common source of supply, thus necessitating a rule something like Rule 48 to assure equity and fairness amongst the owners of the various interests in the common pool.
Transco has the right to pass the costs it incurs in purchasing natural gas through to the consumer. 15 U.S.C., § 3431(c). In this sense, it is not Transco who experiences a burden, it is the consumer. If higher purchasing prices at the wellhead lead to higher prices to the consumer and a loss of markets, this is simply one inevitable consequence of the free market policies of the era of deregulation with respect to which Transco is vested by the negative Commerce Clause with no right to complain.
A final point by Transco here is that the state had a less discriminatory alternative adequate to protect local interest, i.e., a ratable production order as distinguished from a ratable take order. To be sure, one inquiry under the Pike v. Bruce Church balancing test is whether there are available to a state less discriminatory alternatives adequate to protect the local interests implicated, and the Supreme Court has made it clear that this inquiry must be taken seriously. Hughes v. Oklahoma, 441 U.S. at 339, 99 S.Ct. at 1737, 60 L.Ed.2d at 263; Hunt v. Washington State Apple Advertising Commission, 432 U.S. *1323 at 353, 97 S.Ct. at 2446-47, 53 L.Ed.2d at 400-01; Great Atlantic and Pacific Tea Co. v. Cottrell, 424 U.S. at 377, 96 S.Ct. at 930-31, 47 L.Ed.2d at 64.
The search for such alternatives, however, need not be made in connection with our Commerce Clause inquiry until it first be established that the regulation in question creates an unreasonable burden on commerce. This Transco has failed to do  for as explained above, the burdens are on Transco, not interstate pipe lines generally, because only Transco has, wittingly or unwittingly, bound itself to a long term, fixed price gas purchase contract. When that contract is taken out of the case, it is seen that the so-called burdens of Rule 48 disappear.
The point is made crystal clear by Transco's present policy of insisting upon "market-out" provisions in its contract  provisions which allow the price Transco pays to the producer to fluctuate with market price to the consumer. If Transco had negotiated a market-out clause in its contract with Getty, these proceedings no doubt would not be before this Court today.
In summary, we hold that the State of Mississippi via its Oil and Gas Board had the authority to promulgate and has the authority to enforce Statewide Rule 48. Nothing in Rule 48 or its interpretation in Order No. 409-82 contravenes the authority remaining vested in the State of Mississippi once its authority to regulate commerce has been effectively restricted by the negative Commerce Clause. Transco's Assignment of Error No. 3 is rejected.

C. Void-For-Vagueness

Under Assignment of Error No. 4, Transco argues that Rule 48 is void for vagueness. The claim is predicated upon rights said to be vested in Transco by virtue of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.
It is the foremost requisite of a legal system that there be general rules. Where those rules are not made clear and are not published and available to persons in the planning of their economic and social activities, the efficacy of the system is in substantial danger. Fuller, The Morality of Law, 46-51, 63-70 (rev. ed. 1969).
These notions have acquired constitutional status. Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1925) states
"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process."
 269 U.S. at 391, 46 S.Ct. at 127-28, 70 L.Ed. at 328.
An unconstitutionally vague statute or regulation is unenforceable. A.B. Small Co. v. American Sugar Refining Co., 267 U.S. 233, 242, 45 S.Ct. 295, 298, 69 L.Ed. 589, 594-95 (1924).
Most of the void for vagueness cases have arisen in the context of criminal prosecutions. See ABC Interstate Theatres, Inc. v. State, 325 So.2d 123, 125 (Miss. 1976) (obscenity statute overbroad). It is clear, however, that the doctrine applies to civil statutes and to regulations. See A.B. Small Co. v. American Sugar Refining Co., 267 U.S. at 237, 45 S.Ct. at 296, 69 L.Ed. at 592 (applied to civil statute); Hynes v. Mayor of Oradell, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243, 253, (1976) (applied to regulation). On the other hand, when the doctrine applies in the context of economic regulation its strictures are relaxed. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362, 371-372 (1982).
A rule or standard is not objectionable merely because it is stated in general terms and is not susceptible of precise application. Familiar examples of such general standards abound in our law, e.g., negligence, unconscionability, fraud. We doubt anyone would seriously argue today that these standards are unconstitutionally vague.
*1324 Transco focuses its attack upon three aspects of Rule 48. These are (a) "ratable take", (b) "purchase without discrimination", and (c) "same common source of supply". We find these terms readily understandable. Transco's brief demonstrates that they are not susceptible of precise mechanical application, but what law is?
Ratable take suggests a general rule of equity. The phrase refers to the taking of an amount of gas from one well such that the percentage of said amount to the well's allowable is the same as the percentage that the amount taken from a second well bears to the allowable for the second well. Ratable taking connotes fairness. Its synonym is "pro-rata". HBOP, Ltd. v. Delhi Gas Pipe Line Corporation, 645 P.2d 1042, 1046 n. 9 (Okla. Ct. App. 1982).
The concept as we understand it refers to production. It refers to the percentage of allowable production of a common source of supply. It also refers to equity between interests in a given pool. It means that the party "taking" must take pro-rata with respect to the relative interests, percentage-wise, the various owners have in the pool. That the concept is general hardly establishes that it is impermissibly vague.
The phrase "purchase without discrimination" imparts the same meaning. At the risk of being repetitious, purchase without discrimination means to purchase or acquire pro-rata from a given pool the same percentage of one owner's interest as is purchased of another owner's interest. It likewise means, within a given pool or common source of supply, that the party purchasing will purchase the same percentage of one well's allowable as is the case with respect to all other wells in the pool or common source of supply.
We pause here to note that a central question in this case is whether Transco may purchase without price discrimination with respect to the varying interests in the six wells said to be in a common source of supply. As we explain below, the Legislature has not vested the Oil and Gas Board authority to proscribe price discrimination or to inaugurate any other form of regulation of the prices of wellhead sales of natural gas. This is not to say that the Legislature could not endow the Oil and Gas Board with such authority, if it rationally determined that such was consistent with the public interest. We simply hold today that it has not yet done so.
Finally, Transco challenges as vague the term "common source of supply". This one gives us no trouble. The term simply refers to that geological configuration or area within which a significant drainage problem would result if there be unratable taking from one well to another. It is synonymous with "pool".[12]
The Supreme Court of the United States has decided that a state ratable take order, although couched in general language, presents no constitutional infirmities regarding vagueness. Phillips Petroleum Company v. Oklahoma, 340 U.S. 190, 192, 71 S.Ct. 221, 222, 95 L.Ed. 204, 206-07 (1950). We do not regard Corporation Commission v. Champlin Refining Co., 286 U.S. 210, 242-243, 52 S.Ct. 559, 567-68, 76 L.Ed. 1062, 1082-83 (1931) as being to the contrary. Assuming arguendo that Champlin is to the contrary, it has been in part overruled by more recent decisions.

D. Taking Without Compensation

Transco next argues that Order No. 409-82 is an arbitrary and unreasonable exercise of the state's police power and, if enforced, would result in a taking of Transco's property without compensation in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.
It may be true that a taking of private property by governmental action violates the owner's due process rights if the action *1325 bears no reasonable relation to a legitimate governmental purpose or is otherwise arbitrary. Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 70, 57 S.Ct. 364, 371, 81 L.Ed. 510, 518 (1936). Here, however, we have a legitimate governmental purpose. The state has a completely legitimate interest, as articulated in the policy statement of the Conservation Act, to
"safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom."
As discussed previously, it is Transco's contract with Getty  not Rule 48  which effects a "taking" of Transco's property. This sort of "taking" is colloquially known as "business".
We reject out-of-hand Transco's argument that Order No. 409-82 constitutes an impermissible taking of private property without compensation and in so doing we complete our determination that the claims advanced by Transco based in federal law are without merit.

V. Transco's Claims Under State Law

A. The Board's Authority To Promulgate A Ratable Take Rule
Turning to the state law claims, Transco first argues that the Oil and Gas Board was without authority to adopt or enforce a rule requiring ratable taking such as Rule 48. The point is without merit.
The State Oil and Gas Board is a creature of the legislature and, of course, has no authority other than that vested in it by statute. Masonite Corporation v. State Oil and Gas Board, 240 So.2d 446, 449 (Miss. 1970). To ascertain what authority the Board has, we consult the Mississippi Oil and Gas Conservation Act of 1948, originally enacted as House Bill No. 80, Miss. Laws of 1948, Chapter 256, and now codified as amended as Miss. Code Ann. § 53-1-1, et seq., (Supp. 1983).
Looking to the words of that enactment we find in Section 53-1-17(c) Board authority to carry out the general policy directives of Section 53-1-1 which are, in part, that the co-equal and correlative rights of owners in a common source or pool of oil and gas shall be safeguarded to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom. Barnwell, Inc. v. Sun Oil Company, 249 Miss. 398, 406, 162 So.2d 635, 638 (1964).
An understanding of the legislative words emerges from thought about what co-equal and correlative rights such owners have under our law and just why and from what these rights need protection.
Our core concern, at the risk of repetition, is the geological phenomenon of drainage, described in Shell Oil Company v. James, 257 So.2d 488 (Miss. 1971) in this way.
When the pool of oil has been penetrated by a recovery well, the oil and gas located in the pool move from a high pressure area to a low pressure area so that the oil and gas migrate from the property of one landowner to another. This exodus is called drainage. 257 So.2d at 494-495.
In this context we understand the correctness of the observations in one of the leading treatises on oil and gas law, Summers on Oil and Gas, Vol. IA, § 103.1 at 132:
The mere opportunity of a landowner to take his share of the oil and gas in a common source of supply does not provide complete protection of his property rights in them. If others produce and market, he must also produce and market or lose much of his share through drainage and the exhaustion of reservoir energy. He cannot produce and market unless a market outlet is available. To provide market outlets for both oil and gas a few states have enacted common purchaser statutes requiring common carrier pipelines or other persons in business of purchasing oil or gas in a common source of supply to take ratably from all owners.
*1326 The geological realities of the world of oil and gas have sensitized the lawmakers of this state. Phillips Petroleum Co. v. Millette, 221 Miss. 1, 15-17, 72 So.2d 176, 179 (1954) recognizes that the prevention of loss through drainage is required by fundamental notions of equity and justice. Our law has long ago translated these notions of equity and justice into enforceable rights vested in owners of interests in oil and gas rich lands. Shell Oil Company v. James, 257 So.2d 488, 495 (Miss. 1971). It is of such rights that our Legislature speaks when it declares in Section 53-1-1 the public policy of the state that "the co-equal and correlative rights of owners in a common source or pool" be protected. Similarly the Legislature speaks of such rights when Section 53-1-17(c) authorizes the Board to carry out the general policy directives of Section 53-1-1.
Being as redundant as occasionally are judges, our legislators have in Section 53-1-17(c)(12) vested the Oil and Gas Board with the authority to prevent abuse of these correlative rights which may result from non-uniform, disproportionate or unratable withdrawals causing undue drainage between tracts of land or resulting in one or more owners in such pool producing more than his just and equitable share of the production from such pool.
Moreover, the Board has the authority under Section 53-1-17(c)(13) to "prevent, so far as practicable, reasonably avoidable drainage from each developed unit which is not equalized by counter-drainage." Shell Oil Company v. James, 257 So.2d 488, 493 (Miss. 1971).
Beyond that, the Board has implied authority to do what may be reasonably necessary to carry out the specific mandates of the Legislature. State Oil and Gas Board of Mississippi v. Brinkley, 329 So.2d 512, 514-515 (Miss. 1976); Mississippi Public Service Commission v. Chambers, 235 Miss. 133, 142, 108 So.2d 550, 554 (1959).
Couple all of this with the provisions of Section 53-1-17(c) which empower the Oil and Gas Board to make "such reasonable rules, regulations and orders as may be necessary from time to time in the proper administration and enforcement" of the oil and gas conservation laws of this state, State Oil & Gas Board v. Mississippi Mineral & Royalty Owners Association, 258 So.2d 767, 768 (Miss. 1971), and we have more than ample statutory authority vested in the Board enabling the promulgation and enforcement of a rule requiring ratable taking such as Rule 48.
We have upheld the authority of the Board to promulgate a variety of rules with respect to which arguably there is less express statutory authorization than is the case here. See, e.g., Barnwell, Inc. v. Sun Oil Co., 249 Miss. 398, 406-07, 162 So.2d 635, 638 (1964) (Board has power to allocate and apportion production); Frost v. Gulf Oil Corp., 238 Miss. 775, 791-92, 119 So.2d 759, 764 (1960) (Board rules supplement statute); Corley v. Mississippi State Oil & Gas Board, 234 Miss. 199, 211-13, 105 So.2d 633, 638 (1958) (perpetuation of 40 acre units and creation of field-wide unit upheld because the units would protect the co-equal and correlative rights of the owners); Hassie Hunt Trust v. Procter, 215 Miss. 84, 97-98, 60 So.2d 551, 556 (1952) (Board could designate drilling units); Green v. Superior Oil Co., 59 So.2d 100, 101 (Miss. 1952) (upholding Board's spacing rules providing 320 acre units).
Requiring one such as Transco to take what it does not want should not be done lightly. The right to purchase what one wants (at a negotiated price) and to decline the purchase of what one does not want is normally secured, absent extraordinary circumstances. On the other hand, the general contours of the police power of the state have become well-established, and that power may qualify rights otherwise secured.
In Superior Oil Company v. Foote, 214 Miss. 857, 59 So.2d 85 (1952), this Court, speaking of the exercise of the police power as vested in the Board, had this to say:
The police power of the state includes not only regulations to promote public *1327 health, good morals, and good order, but also the . .. [authority] to regulate and to promote development of industry and utilization of natural resources in order to add to the wealth and prosperity of the state. 214 Miss. at 875, 59 So.2d at 93.
A corollary desideratum equally susceptible of lawful achievement via the state's police power calls for a currently fair division of those natural resources. This the policy statement of Section 53-1-1 proclaims when it declares it in the public interest to safeguard, protect and enforce the co-equal and correlative rights of owners in a common source of supply. This our Court has embraced when, in Superior Oil Co. v. Foote, we recognized that in the lawful exercise of its police power
the state may enact regulatory laws for and proscribe methods of extracting oil and gas for the ... protection of the correlative rights of all owners in a common source of supply. 214 Miss. at 876, 59 So.2d at 93.
Accepting values from our past, our law continues to cherish freedom of contract and freedom to contract. U.S. Const. art. I, § 10, cl. I; Miss. Const. art. III, § 16 (1890). Those freedoms, however, are not unqualified. This Court has repeatedly recognized that ordinary economic freedoms generally secured are
qualified by a proper exercise of the police power of the state... . Hence it is said that all contract and property rights are subject to a reasonable exercise of the police power.
Superior Oil Co. v. Foote, 214 Miss. at 876, 59 So.2d at 93; Mississippi Milk Commission v. Vance, 240 Miss. 814 at 857, 129 So.2d 642 at 661 (1961).
The Supreme Court of the United States has likewise recognized that the prohibitions of the facially absolute Contract Clause
must be accommodated to the inherent police power of the State "to safeguard the vital interests of its people".
Energy Reserves Group, Inc. v. Kansas Power and Light Company, 459 U.S. 400, 401, 103 S.Ct. 697, 704, 74 L.Ed.2d 569, 580 (1983).
The Legislature of this state has lawfully empowered the State Oil and Gas Board to protect the co-equal and correlative rights of owners in a common pool of natural gas. The Board's ratable take rule is a proper exercise of the authority so vested in it.
Without further ado, we hold that the State Oil and Gas Board has the authority to promulgate a rule requiring ratable taking, such as Rule 48, and has the authority to enforce that rule according to its tenor. We affirm so much of the order of the State Oil and Gas Board as requires Transco, if it takes at all from a common source of supply, to take ratably; that is, Transco is required to offer in good faith to purchase from every one of the various producing interests in the common source of supply[13] the same percentage of those producers' gas as it purchases from that producer the highest percentage of whose interest Transco takes.
This is consistent with the language of Rule 48. It is likewise consistent with the authority vested in the State Oil and Gas Board by the Legislature. It is finally consistent with geological realities and national and state public policy, insofar as we are able to discern them.
Fixing prices, however, is another matter.

*1328 F. The Board's Lack of Authority To Regulate Prices or Proscribe Price Discrimination

Order No. 409-82 does not in clear and unequivocal language prohibit Transco's price discrimination. The order does not specifically order Transco to pay all non-contract owners in the common pool the same $7.907 per mmbtu as Transco is paying Getty. The order merely provides that Transco is ordered
(a) to comply with Statewide Rule 48,
(b) if it takes natural gas from the Harper Sand Gas Pool, to "ratably take from the wells producing from the common pool,"
(c) "to ratably take and purchase gas without discrimination in favor of one owner, operator or producer against another in the said common source or pool", and
(d) if it elects to take from the pool, to "ratably take and purchase without discrimination in favor of the operators Getty and Tomlinson against Coastal, the Fairchilds, and Inexco".
It is tempting to speculate regarding the reason the Board stuck so close to the exact language of Rule 48 and, by way of contrast, eschewed use of any language expressly proscribing price discrimination and requiring that Transco pay one and all the $7.907 per mmbtu price. Such a proscriptive order would hardly wash when Transco is paying Tomlinson $6.511 per mmbtu, and Florida Exploration $8.4066, and Sabine $5.00; and so forth  all in the same common source of supply. More fundamentally, the Board's choice of wording in Order No. 409-82 telegraphs its own uneasiness about its authority to regulate prices or prohibit price discrimination.
Notwithstanding the arguable vagueness of the order, everybody has construed it to proscribe Transco from further discrimination in price paid producers in the common pool. For example, Coastal's brief before this Court states
"At the trial, we all knew that the issue was price... The record is literally replete with statements by Transco's counsel and witnesses that the only issue was price."
 (Brief of Coastal Exploration, Inc., served November 29, 1983, at 66)
Our review of the record and the course of proceedings before the Board, and subsequently the Circuit Court, together with our study of the briefs of the parties, convinces us that price is and from the outset has been a major issue in this controversy. It is in this context that we turn to Transco's next argument, to-wit: Assuming arguendo that the Oil and Gas Board has lawfully required ratable taking, the Board has no authority to regulate or proscribe differences in price. In large part, we agree.
Our approach is the same as before. The Board has only that authority which the Legislature has constitutionally and lawfully vested in it. Our question becomes, has the Legislature vested the Board with authority to fix wellhead or first sale prices purchasers such as Transco must pay for the gas they take?
Before it may be sustained, the price regulation feature of Order No. 409-82 must find its undergirding authority in the enactments of the Legislature. Masonite Corporation v. State Oil and Gas Board, 240 So.2d 446, 449 (Miss. 1970). Order No. 409-82 may not be validated solely by reference to the language of Rule 48 for the obvious reason that the Board may not give one of its rules a construction beyond the scope of the enabling authority emanating from the Legislature.
Our point of inquiry is not whether the State of Mississippi acting through its duly constituted Legislature has the authority to engage in price regulation. This authority lies well within what is commonly referred to as the police power of the state. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Mississippi Milk Commission v. Vance, 240 Miss. 814, 855, 129 So.2d 642, 660 (1961). We are concerned with the narrower question whether the Legislature has vested the Board with *1329 authority to make or enforce price regulation measures such as those found in Order No. 409-82. In search of the answer we again consult the Mississippi Oil and Gas Conservation Act of 1948, as amended, and that source only.
Keep well in mind the general policy of this state and this nation: that prices for the sale of goods or services ought to be the product of an arms-length bargain in particular and of the market place in general. Price regulation measures remain the exception. Because they are the exception and because they do violence to the generally valid values and economic realities represented by such catch phrases as "freedom of contract" and "supply and demand", price regulation measures must be authorized in clear and unmistakeable language.
The authority to regulate prices is a drastic departure from the norm. It may never be left to implication. If it has not been expressed, it does not exist.
This state today regulates the price paid by the consumer for electricity, natural gas and telephone service. Insurance premiums are also the subject of state regulation. In each of these instances the authority to regulate is delegated to the administrative agency in clear and unmistakable language. A familiar example of this from the not too distant past is the Mississippi Milk Commission Act, Senate Bill No. 1757, chapter 155, Laws of 1960. Mississippi Milk Commission v. Vance, 240 Miss. 814, 860, 129 So.2d 642, 662-663 (1961).
Against this backdrop we regard the stark contrast presented by the Mississippi Oil and Gas Conservation Act of 1948. First, we find no mention of a need to regulate wellhead sales prices in the declaration of policy in Section 53-1-1. Beyond that, there is no such authority provided in Section 53-1-17, the statute enumerating the lawful powers of the Board. Not even the newly enacted Section 53-1-17(f)[14] provides any such authorization. Indeed, the word "price" is not used, nor any of its synonyms.
The only mention of the term price in any legislative language empowering the Board appears in Section 53-1-17(c)(17), to wit:
To make such determinations of oil and/or natural gas maximum lawful ceiling prices as allowed by federal or state law.
The price regulation feature of Order No. 409-82 obviously is not a determination of maximum lawful ceiling prices within Section 53-1-17(c)(17). As indicated at the outset, we are concerned here with deregulated gas.
Turning to the history of the Conservation Act and the Board's experience with it, we again find no hint that the Board has heretofore considered that it had price fixing authority. In part this might be explained by the pre-1978 federal preemption of the pricing of wellhead first sales. Northern Natural Gas Co. v. State Corporation Commission of Kansas, 372 U.S. 84, 91-92, 83 S.Ct. 646, 650-51, 9 L.Ed.2d 601, 607 (1963); Phillips Petroleum Company v. Wisconsin, 347 U.S. 672, 682-84, 74 S.Ct. 794, 799-800, 98 L.Ed. 1035, 1047-48 (1954). Whatever the reason  because Natural Gas Act of 1938 had preemptive effect, because such price regulation is not needed to give owners adequate and reasonable protections against the perceived evils of drainage, or because collectively the Legislature never thought of the matter, the outcome determinative fact is that the Legislature simply has not vested the Board with authority to fix wellhead first sale prices of natural gas. This is so whether the price fixing be done directly or under the ruse of prohibiting discrimination.
Rule 48 has been promulgated for over thirty years. We are aware of no evidence prior to Order No. 409-82 that the Board has heretofore considered Rule 48 to proscribe price discrimination. The primary prior Board proceeding discussed in the briefs is In re Petition of Cenard Oil and Gas Co., Docket No. 60-64-92, Order No. 81-64, dated April 16, 1964. In that case the Board correctly found Southern Natural Gas Co.'s refusal to purchase gas from *1330 Cenard's two wells completed into a common reservoir at the same rate as it purchased from another to be a violation of Rule 48. The Board's order directing Southern Natural to take ratably and otherwise comply with Rule 48 makes no mention of price.
We are loathe to tell an administrative agency how to construe its own rule. In this case the Board has determined to enforce an order in part at least unathorized by the enabling legislation. In this context it becomes our responsibility to advise the Board that the only lawful interpretation of the rule is that Transco, if it desires to take at all from a common source of supply, must take ratably. With respect to price, that is a matter of private negotiation between the parties. Any owner who wishes to enter into a contract with respect to the sale of his interest is free to do so. If for whatever reason, the owner wishes to "play the market", he is entitled both to the benefits of a high demand market and the burdens of a market glut such as we have now. Any other interpretation of the rule is arbitrary, capricious and unlawful.
All of this is particularly true when it is remembered that the statute has not authorized the Board to engage in price regulation and when it is likewise remembered that the dominant legislative concern was protecting producers and owners from the geological phenomenon of drainage, a far different matter from the economic phenomenon of price discrimination.
Mississippi is not the only natural gas producing state which has determined that requiring ratable taking without any regulation of or prohibition on discrimination in price is a rational state policy. The Louisiana Supreme Court has interpreted language similar to Rule 48 in its common purchaser statute as applying only to quantity and not price. In State v. Arkansas Louisiana Gas Co., 227 La. 179, 78 So.2d 825 (La. 1955), Arkla was brought to trial for offering only five cents per one thousand cubic feet of gas (mcf)[15] to some when it was paying others 11¢/mcf for gas produced from the same pool. As in this case, the issue was price only. Louisiana's attorneys contended that the term "purchase ... without discrimination" in the statute must include price differences or else the statute would be meaningless. The court responded:
... We cannot find or discern any prohibition against `price' discrimination, and we cannot read such a prohibition into the statute... .
It is manifest that the statute was obviously drawn to prohibit discrimination solely in the matter of quantity, to prevent unfair, discriminatory and inequitable abuses in the distribution of natural gas, not as to prices to be paid, but solely to give security to producers in that they would all stand on an equal footing insofar as access to a market through pipeline facilities would be made available. The statute sought to alleviate and prevent the abuses whereby some producers were favored as against others, some afforded markets, others ignored, and, by the process of prorating among producers, assured them that no one would sell more than the other in a... [common source of supply]. 227 La. at 188-89, 78 So.2d at 828 [Emphasis added]
The construction Louisiana's Supreme Court has placed on its ratable take statute, of course, is not controlling here. In determining that the Mississippi Legislature has not decided that a regime of price regulation or a prohibition on discrimination in wellhead sales prices are necessary parts of the state's important policy of protecting the "the co-equal and correlative rights of owners in a common source" of supply, although it may well have the authority to so provide, we take comfort from the fact our present law and policy are consistent with what at least one sister natural gas producing state has done.
*1331 There is a final reason why we have refused to imply Board authority to regulate wellhead sales prices. For the moment we have difficulty understanding how the sort of price regulation attempted in Order No. 409-82 serves legitimate public interest as distinguished from private self-interests.
Price differentials emanating from arms-length contract negotiations are surely not contrary to the public interest. Many legitimate economic factors may produce such differentials, not the least of which would be the length of the contract, whether the price was fixed or subject to variation, supply and demand and other prevailing and reasonably foreseeable market conditions. The record before this Court reflects 35 contracts ranging from $5.00 to $9.054 per mmbtu. The record also suggests that these differentials are the proximate result of different dates of contracting and rapidly changing market conditions, both of which will ordinarily be considered rational bases for differences in price interference with which is beyond the Board's authority.
Transco, required to take ratably by Rule 48, is free to offer owners having no contract a price reasonable in the context of the then existing market conditions. If the owner thinks the price is too low and wishes to risk drainage, he does not have to sell. But he has no legal redress simply because he failed to lock in a price via contract at a time when the market was more favorable.
The owners of interests in a common source of supply are perfectly free to contract for the sale of their share of production on whatever terms they can negotiate. If owners such as Coastal desire to operate without a contract, for whatever reason, this is their privilege. If there should be an overall market shortage and increased demand amongst consumers, parties such as Coastal certainly stand to benefit. On the other hand, where a market glut and decreased demand occur, Coastal and others no doubt suffer.
Why in an era of deregulation freedom of contract is perceived to be bad as a matter of policy escapes us. The national policy, to be sure not a preemptive one, is that the price of natural gas at the wellhead shall be regulated by market and geological forces, not judicial or administrative fiat. Regulation as heretofore practiced has failed. Whatever bugs may remain in the "deregulation system" and whatever fine tuning may be needed in our laws, the efficacy of regulation remains questionable and its substantial costs demonstrable. Pierce, Reconsidering The Roles of Regulation And Competition In The Natural Gas Industry, 97 Harv.L.Rev. 345, 371-372 (1983). The ultimate regulator of the price of such gas, at least for the moment, is what the consumer is willing to pay, with FERC interjecting itself into the picture only where wellhead prices have been set by fraud or collusion.
A caveat need be added: we do not hold that a pipeline purchaser may offer any terms, take-it-or-leave-it, and meet its Rule 48 obligations. Offering a working interest owner a choice between a substantially below market price or otherwise wholly unreasonable terms, on the one hand, and drainage, on the other, is simply not a ratable taking and is a violation of Rule 48. To comply with its Rule 48 obligations the pipeline must offer in good faith reasonable terms, including a reasonable price, determined by reference to prevailing market conditions and other appropriate economic considerations.
Of course, nothing in Rule 48 requires that Transco take any gas from a given source of supply. If it takes at all, however, it must take, or in good faith offer to take, ratably.
So much of Order No. 409-82 as may be construed to require that Transco, in the course of performing its lawful duty to take ratably, pay Coastal and others not under contract $7.907 per mmbtu is reversed.

G. Miscellaneous Other Alleged Errors in Board Rulings
Transco presents to the Court further assignments of error, denominated in its brief, Reversible Errors In The Board's Rulings.
*1332 First, Transco argues that the Board was arbitrary and capricious in finding that Transco was discriminating against Coastal and owners of relatively small working interests in violation of Rule 48. We made clear above in Section II(C) entitled "Non-Facts" that neither the "size" of the parties nor of their interests was a fact of legal significance here. Nothing said in the intervening pages should cause us to lose sight of that elementary proposition.
In any event, our substantive holding that Transco has lawfully been ordered to take ratably (if it takes at all) and to take ratably the gas of each owner in the common pool without regard to size of owner or interest coupled with our further holding that the Board has no authority to engage in price regulation should effectively dispose of this issue.
Next, Transco argues that there is no substantial evidence to support the Board finding that ratable production occurred prior to July 1, 1982, and that Transco's "cutback" has or will cause non-ratable withdrawals or drainage. The point is specious. There may well be reasons not attributable to Transco why there may not have been ratable production prior to July 1, 1982. This would do nothing to ameliorate the undeniably discriminating effect of Transco's refusal after July 1, 1982, to take ratably, and more specifically, to take the production of the non-contract interest owners. The assignment of error is rejected.
Finally, Transco argues that the Board improperly refused to receive and consider relevant evidence proffered by Transco and other parties to the substantial prejudice of Transco. We find no merit in this contention.
The hearing of this matter was had in accordance with the official Rules of Order And Procedure For Hearings Before The Board, Order No. 201-51, Rule 13(c) of which provides
(c) The materiality, relevancy and competency of any testimony shall be subject to challenge by any party to the hearing or by any member of the Board. When so interposed, such objections shall be acted upon by the Chairman or by the Acting Chairman, his ruling thereon being subject to change by a majority vote of the Board members then sitting.
There is no necessity for enumeration of the points recited by Transco here. Suffice it to say that Transco has not suffered cognizable prejudice from any of the Board's evidentiary rulings, in that none of the excluded evidence would have proved or tended to prove that after July 1, 1982, Transco was taking ratably. Absent prejudice, any error in exclusion is harmless and cannot be grounds for reversal. Planters Bank v. Garrott, 239 Miss. 248, 270, 122 So.2d 256, 264 (1960). All other assignments of error not heretofore expressly passed upon are denied and rejected.

IV. Conclusion

For the reasons set forth above, so much of Order 409-82, and the Circuit Court's affirmance thereof, as requires that Transco, if it takes or purchases natural gas from the Harper Sand Gas Pool in Greens Creek and East Morgantown Fields, take ratably from the common pool and without discrimination in quantity or percentage thereof in favor of one owner, operator or producer against another in such common pool is affirmed.
So much of Order 409-82, and the Circuit Court's affirmance thereof, as may be construed to require that Transco, if it takes or purchases from said pool, purchase without discrimination in price is reversed and rendered.
This matter is remanded to the Circuit Court with instructions that the matter be further remanded to the State Oil and Gas Board for such further proceedings as may be appropriate not inconsistent with this opinion.
Taxable costs in this Court, before the Circuit Court, and before the Board shall be and they hereby are taxed one-half against Transco as Appellant and one-half against Appellees, jointly and severally, for all of which let execution issue.
*1333 AFFIRMED IN PART; REVERSED AND RENDERED IN PART, AND REMANDED.
WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, and SULLIVAN, JJ., concur.
PATTERSON, C.J., and BOWLING and HAWKINS, JJ., not participating.
NOTES
[1] The term "producer" as used in this opinion means the owner of all or part interest in a well or wells capable of producing natural gas. An "owner" may also be a "producer". Miss. Code Ann. § 53-1-3(h) (Supp. 1983); Statewide Rule 2(g), Miss. Oil and Gas Board Rules, promulgated November 19, 1951, effective January 1, 1952.

The term "owner" has been defined as any person who has the right to drill into and produce from any pool, and to appropriate the production either for himself or for himself and another or others... .
Miss. Code Ann. § 53-1-3(g) (Supp. 1983); Statewide Rule 2(p), Miss. Oil and Gas Board Rules, promulgated November 19, 1951, effective January 1, 1952.
[2] The term "operator" as used in this opinion means

any person who, duly authorized, is in charge of the development of a lease or the operation of a producing well.
Statewide Rule 2(r), Miss. Oil and Gas Board Rules, promulgated November 19, 1951, effective January 1, 1952. An "operator" may also be a "producer" or an "owner" or both.
[3] The term "field" has been defined in our law as

the general area which is underlaid or appears to be underlaid by at least one pool; and "field" shall include the underground reservoir or reservoirs containing oil or gas or both. The words "field" and "pool" mean the same thing when only one underground reservoir is involved; however, "field", unlike "pool", may relate to two or more pools.
Miss. Code Ann. § 53-1-3(f) (Supp. 1983); Statewide Rule 2(o), Miss. Oil and Gas Board Rules, promulgated November 19, 1951, effective January 1, 1952.
[4] The term "pool" has been defined in our law as

an underground reservoir containing a common accumulation of oil or gas or both. Each zone of a general structure which is completely separated from any other zone in the structure is included in the term "pool" as used herein.
Miss. Code Ann. § 53-1-3(e) (Supp. 1983); Statewide Rule 2(n), Miss. Oil and Gas Board Rules, promulgated November 19, 1951, effective January 1, 1952. The term "pool" is synonymous with "common pool or source of supply" in the Conservation Act's declaration of policy, Miss. Code Ann. § 53-1-1 (Supp. 1983) and with the phrase "same common source of supply" as used in Statewide Rule 48, Miss. Oil and Gas Board Rules.
[5] Reservoir discovery data taken from the Mississippi State Oil and Gas Board Mississippi Oil and Gas Production Reports for 1978, 1979 and 1980.
[6] An operating agreement is the usual means in the oil and gas industry of defining the rights and duties of an operator vis a vis the non-operating owners of a well. In this case, every well involved in this dispute was covered by a form operating agreement known as the AAPL Form 610-1977 Model Form Operating Agreement. Of particular interest is the provision in that agreement concerning the sale of gas owned by non-operators:

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the contract area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost ...
In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the contract area, operator shall have the right, subject to the revocation at will by the party owning it, but no the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price attainable in the area for such production... . Any purchase or sale by operator of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances but in no event for a period of in excess of one year. [emphasis added]
[7] For a perceptive consideration of the natural gas market today, see Pierce, Reconsidering The Roles of Regulation And Competition In The Natural Gas Industry, 97 Harv.L.Rev. 345 (1983); and Pierce, Natural Gas Regulation, Deregulation and Contracts, 68 Va.L.Rev. 63 (1982). In the former article, Prof. Pierce documents the statement that "the market for gas would clear today at a price somewhere between four and five dollars". 97 Harv.L.Rev. at 351 (see note 43 and accompanying text).
[8] The Mississippi State Oil and Gas Board determines the maximum allowable natural gas withdrawal rates for each gas producing pool. Each well's allowable is its "maximum efficient rate of production" as determined by semi-annual deliverability tests made by the operator of each well. See Rule 34(B), Miss. Oil and Gas Board Rules, promulgated November 19, 1951, effective January 1, 1952.
[9] Prof. Richard J. Pierce, Jr., has described well the basic statutory scheme of the Natural Gas Policy Act of 1978.

For purposes of deregulation, the NGPA can be considered to have created three major categories of gas. "High-cost gas," a narrowly defined category that accounts for only a tiny fraction of aggregate gas supply, was deregulated in November 1979. "New gas," the second category, was subject to price ceilings for various subcategories that resulted in an average price of $2.42 per MMBtu in 1980. These ceilings will increase over time in constant dollars, because most new gas price ceilings will increase at a rate slightly higher than inflation. New gas will be deregulated sometime between 1985 and 1988. "Old gas," the third category, is subject to price ceilings for various subcategories that result in an average price of approximately $1.75 per MMBtu. With the exception of some intrastate old gas that will be deregulated in 1985, old gas will continue to be subject to the same price ceilings in constant dollars indefinitely, because the price ceilings applicable to most subcategories of old gas will increase over time only at the inflation rate.
Under the NGPA, Congress expected deregulation to occur gradually through the following sequence. First, high cost gas was deregulated in 1979 in recognition of the need for special economic incentives to encourage exploration for and production of high cost gas. Second, new gas and most intrastate gas is scheduled for deregulation between 1985 and 1988 as the major step in the deregulation process. The annual increase in the price ceiling for new gas was expected to ease the transition to deregulation by permitting the price of new gas to reach approximate parity with the market price of oil by the time of deregulation. Third, although old gas is never scheduled for deregulation, the gas production market is expected to evolve gradually into a totally unregulated market as old gas becomes less of a factor in the aggregate national gas supply. Old gas subject to continuing price ceilings is expected to account for only about one-half of aggregate supply in 1985, with its proportional contribution to national supply diminishing every year. [Emphasis added]
Pierce, Natural Gas Regulation, Deregulation and Contracts, 68 Va.L.Rev. 63, 87-89 (1982); see also, Pierce, Reconsidering The Roles Of Regulation And Competition In The Natural Gas Industry, 97 Harv.L.Rev. 345, 348-350 (1983). As explained above, all of the gas with which we are here concerned is deregulated high cost gas, de facto as well as de jure.
[10] See Pierce, Natural Gas Regulation, Deregulation and Contracts, 68 Va.L.Rev. 63, 69-72 (1982); and Pierce, Reconsidering The Roles of Regulation And Competition In The Natural Gas Industry, 97 Harv.L.Rev. 345, 371-372 (1983).
[11] Other natural gas producing states have comparable ratable take regulations sometimes referred to as "common purchaser" statutes. Kan. Stat. Ann. § 55-703 (Supp. 1983) (Kansas); La. Rev. Stat. Ann. § 30:42 (West Supp. 1984) (Louisiana); Neb. Rev. Stat. § 57-907 (1979) (Nebraska); N.M. Stat. Ann. § 70-2-19 (Supp. 1984) (New Mexico); N.D. Cent. Code § 49-19-07 (1978) (North Dakota); Okla. Stat. Ann. tit. 52, § 23 and 233 (West 1969) (Oklahoma); Tex.Nat. Res.Code Ann. § 11.083 (Vernon 1978) (Texas).
[12] See supra note 4.
[13] This is as good a spot as any to note our concern that we may not know accurately how many wells are in the common pool or common source of supply, i.e., how many wells are subject to drainage if Transco continues to take 100 percent of the allowable from the two Florida Exploration wells. The Board finds as a fact that the six wells: (1) Getty-Rogers, (2) Getty-Sipp, (3) Getty-Buckley, (4) Tomlinson-Willoughby, (5) Florida-Carlisle and (6) Florida-Barnes are producing from a common pool. Getty offered convincing proof that there may be others, and we find nothing in the Board's finding of fact which rejects that proof. Should there be other producers or owners who are suffering drainage, they will have to make that fact known to the appropriate tribunal before they may be afforded any relief.
[14] See Chapter 506, Miss. Laws of 1983, originally House Bill No. 919.
[15] The two predominant units of natural gas measurement, one thousand cubic feet (mcf) and one million British thermal units (mmbtu), contain approximately equivalent amounts of energy.